United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUAN ANTONIO CABRERA,
Petitioner,

v.

BRIAN CATES,
Defendant.

Case No. 20-cv-01256-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: ECF No. 20

Before the Court is Petitioner Juan Antonio Cabrera's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 20. The Court will deny the petition and deny a certificate of appealability.

## I. PROCEDURAL HISTORY

In 2014, a California jury found Cabrera guilty of fourteen counts of forcible lewd acts upon a child, Cal. Pen. Code § 288(b)(1), and two lesser included charges of assault, § 242, and battery, § 240. ECF No. 26-3 at 347–382. On January 16, 2015, the court sentenced Cabrera to a term of seventy-five years in prison. ECF No. 26-3 at 517–18.

Cabrera appealed. On January 11, 2019, the California Court of Appeal affirmed Cabrera's conviction, but modified the judgment to award Cabrera conduct credit for presentence confinement. *People v. Cabrera*, No. A144206, 2019 WL 168534 (Cal. Ct. App. Jan. 11, 2019). The California Supreme Court denied review on April 24, 2019. ECF No. 26-5 at 930.

Cabrera filed a petition for habeas corpus in federal court on February 19, 2020. ECF No. 1. The Court stayed the action so Cabrera could exhaust his state court remedies. ECF No. 11. Once notified that Cabrera had exhausted his claims, the Court lifted the stay and issued an order to show cause. ECF No. 18. Cabrera then filed this amended petition for writ of habeas

United States District Court
Northern District of California

corpus. ECF No. 20.

## II. STATEMENT OF FACTS

The following background facts are taken from the January 11, 2019 opinion of the California Court of Appeal:[1]

> A. The Prosecution's Case
>
> 1. Jane Doe I
>
> Jane Doe I was born in 2003. She was 10 years old when she testified at trial. Her sister Jane Doe II was born in 1993.
>
> Jane Doe I testified that she previously told police defendant had touched her. She explained she did so because a friend of hers told her that defendant "was supposedly touching" her (Jane Doe I). After she talked to a police officer, she went to speak with a woman in Martinez at the Child Interview Center (CIC). Before that interview, her mother, G.V., told her to lie because G.V. was scared the police were going to take Jane Doe I and her siblings away, and put her and defendant in jail. Jane Doe I first told the woman at CIC that defendant had "accidently" touched her but subsequently revealed this was a lie. She then told the woman defendant had molested her. However, she testified at trial that she had actually fabricated the molestation story. She also said that she thinks defendant "is a great guy" and is like a father to her. She still loved him and did not want him to go to jail.
>
> During a second CIC interview, Jane Doe I talked about defendant touching her and how the touching scared her. At trial, however, Jane Doe I testified that she did not recall giving any details as to how she had been touched by defendant, and said the events she disclosed during her interviews never really happened. She explained that she lied about the molestations because her real dad was sick at the time and she was scared that he would die.
>
> 2. G.V.
>
> G.V. testified that she had known defendant for about nine years by the time of trial. She has four children, Jane Doe I, Jane Doe II, and two sons named J.C. and I.C. When the events of this case started, defendant was staying at her house three or four times a week. Before the police got involved, neither of her daughters ever told her anything about defendant touching them. The first time she heard that Jane Doe I was making serious allegations against him was when she was

---

[1] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness. *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

United States District Court
Northern District of California

called to her daughter's school on February 15, 2013.

G.V. denied having told the police that Jane Doe II had disclosed defendant had touched her inappropriately. She also denied telling the police that Jane Doe I told her defendant had touched her breast. She admitted she told the police that Jane Doe I had reported defendant kissed her on the mouth, but explained she said it only to support her daughter. Actually, the girl had never told her anything. She also said she told the police that defendant had admitted to touching Jane Doe I on the breast, even though he had never said that. She told the police these falsehoods because she was afraid and wanted to be with her children. She also falsely reported that defendant had apologized for touching the girls inappropriately. At trial she testified that he did apologize to the family for having caused any offense, but had not specifically apologized for touching the girls. She said she lied to police when she told them he had promised he would not touch them anymore.

G.V. admitted she told Jane Doe I to lie before her first CIC interview. She was afraid, as she had already been threatened with arrest and with having her children removed. After defendant was arrested, she told her children not to talk to the police. She did so because they had already been interviewed without her permission. However, at the earlier preliminary hearing, she said she told them not to speak with the police because she did not want to get defendant in trouble. Before Jane Doe I's second CIC interview, she told the girl to say she had been touched, because G.V. had already said that to the police when she was trying to support her. She denied telling Jane Doe II to lie; however, the prosecutor confronted her with a transcript of a police interview that showed G.V. had previously admitted to telling both girls to lie and say that nothing had happened.

An April 10, 2013 jailhouse phone call between G.V. and defendant was played for the jury. At trial, she denied that he instructed her to have Jane Doe I say the opposite of what she told the police so that there would be two different versions and there would not be any credibility. The transcript of the phone conversation directly contradicts her. [FN 2] On cross-examination, G.V. said defendant was never left alone with her children.

> [FN 2] At one point during the conversation, defendant says, "Okay. So, as soon as you take the girl, she only has to s—to say the opposite, and—and then there will be two—two different versions and then there won't be credibility."

3. Jane Doe II

Jane Doe II was 20 years old at the time of trial. She denied defendant touched her inappropriately or kissed her when she was in high school. She also denied ever telling the police that he had kissed her on her lips or touched her on her butt. She testified that she did not remember telling the police that on one occasion defendant had gone into the bathroom when she and her sister were taking a shower together and tried to pull back the shower curtain. She denied Jane

United States District Court
Northern District of California

Doe I had told her that defendant was touching her inappropriately, and she did not remember telling the police that Jane Doe I had confided in her. She also did not remember if she had talked to the police about this case.

Later in her testimony, Jane Doe II acknowledged that she did speak to the police, but stated she was lying when she did. She also admitted she had lied earlier when she said she did not remember that she had spoken to the police. But she said G.V. did not tell her to lie. A DVD of her interview with the police was played for the jury. Jane Doe II then testified inconsistently as to whether Jane Doe I had ever disclosed defendant's molestations to her.

4. Dr. Jim Carpenter

Dr. Jim Carpenter, a child abuse pediatrician, testified as both the prosecution's Child Sexual Abuse Accommodation Syndrome (CSAAS) expert and as the doctor who medically examined Jane Doe I. Before Dr. Carpenter testified, defense counsel argued evidence of CSAAS should not come in, but if it did, "I think it should be limited to very limited purposes," and not be used as evidence that very few children who recant do so because the abuse did not happen. The trial court offered to read CALCRIM No. 1193 before Dr. Carpenter's testimony and suggested defense counsel also draft a special instruction. Counsel stated that she did not object to the idea that children can delay reporting, or may recant when the allegations are true. She was more concerned about the concept that children do not usually recant false allegations, and that false allegations are rare. The court indicated it was not expecting Dr. Carpenter to testify in such a manner and that if he did, the court would strike the testimony and tell the jury to disregard it.

Before Dr. Carpenter testified, the trial court gave the jury a standardized version of CALCRIM No. 1193: "You will hear testimony from Dr. Carpenter regarding [CSAAS]. Dr. Carpenter's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not (Jane Doe I's) conduct was not inconsistent with the conduct of someone who has been molested and evaluating the believability of her testimony." [FN 3]

> [FN 3] After closing arguments, the jury was instructed again with CALCRIM No. 1193, along with a special instruction presumably drafted by defense counsel: "You may not consider evidence of [CSAAS] to automatically conclude that where a child meets all or some of the five criteria, that the child has been abused. The People still have the burden of proving each count beyond a reasonable doubt."

Dr. Carpenter testified that he worked for Contra Costa County Health Services as a child abuse pediatrician and that he ran the child abuse program. He does nonacute examinations of potential child victims at CIC. Without objection, the trial court qualified him to testify as an expert in the area of CSAAS.

United States District Court
Northern District of California

Dr. Carpenter testified as to certain "myths" associated with child sexual abuse. One myth is that strangers are the ones that commit these crimes. Stranger assaults are actually "quite rare" as "the majority of child sexual abuse is perpetrated by somebody who's known and trusted by the child." He also noted it is not common for a victim to immediately disclose sexual abuse. Well under 10 percent of victims "come forward and actually are brave enough to divulge that they have been victimized." At that point, the court and counsel had an off-the-record discussion at defense counsel's request.

Dr. Carpenter then described the five "components" of CSAAS. The first is secrecy, where a child understands certain things should not be disclosed. The second is a child's feeling of helplessness, which leads to the third component of sensing entrapment while at the same time accommodating the abuse by making adjustments in order to survive. He further explained that children can feel powerless when they are not believed by other family members, and may ultimately disclose the abuse to someone outside of the family. The fourth component occurs when a child does make a revelation, which can be very delayed and may be a partial or inconsistent story.

Unprompted, Dr. Carpenter stated that children do not like to say things that upset their parents, and "sometimes when they first make an attempt to make a revelation, for example, telling their mother that somebody is abusing them, what the mother does makes a huge difference on how the child will fare. If she's . . . supportive and believing, the child does much better. If she can't—" At this point defense counsel objected, without specifying the nature of the objection. The court sustained the objection, saying, "And besides, it's turning into a narrative. [¶] Let's confine it."

Dr. Carpenter then addressed the fifth component of CSAAS, which is retraction or when the child takes back his or her revelation, often because the family gets disrupted and the child feels guilty. The prosecutor asked, "[A]s far as retraction goes, is it affected by how either the mother or the non-abusing parent figure reacts?" Dr. Carpenter responded "Very much so. We often see more retractions when the parent who is told about—" Again, defense counsel asked to approach the bench and another unreported sidebar was held, after which the prosecutor stated he wanted to "change subjects from the (CSAAS)" and turned to Dr. Carpenter's nonacute examination of Jane Doe I.

Dr. Carpenter testified that he saw Jane Doe I on May 13, 2013. On that date, Jane Doe I was 9 years old, going on ten. The exam occurred after her two CIC interviews. He described how he generally conducts the examinations. He first asked Jane Doe I to tell him about her family. He also asked her if she had been touched on various parts of her body, which she denied. This was a medical interview, and her mother and Jane Doe II were allowed to be present.

In cases where the history of molestation happened months earlier, Dr. Carpenter would expect "normal or normal variant" examinations. The trial court sustained defense counsel's relevance and beyond the scope objection when Carpenter stated that "[a] lot of

people who have sexual relationship with children want it to be a continuing contact, so it's against their purposes to actually injure the child." In this case, Jane Doe I's exam revealed no genital trauma. He said these findings were consistent with the police reports because "she basically never described any injurious touches. She basically had described fondling. And there was really no mention of pain or bleeding with any of the contacts."

During a break, defense counsel complained about Dr. Carpenter's testimony: "Exactly the concerns I raised happened throughout his testimony. And I blame [the prosecutor] less than Dr. Carpenter. A comment such as, [']And of course she said nothing happened.['] What? What do you mean [']of course she said nothing happened?[']" [FN 4] Counsel also highlighted Dr. Carpenter's remarks about mothers who do not believe their children and about how fondlers chose not to injure children as having been "case specific to this case in ways that are really detrimental." The trial court stated the remedy would be to draft the special instruction that they had discussed earlier. The court also noted Dr. Carpenter's voice had a very flat intonation that was "almost sleep inducing," suggesting the jury might not have absorbed all of his testimony. The court also disagreed with counsel's suggestion that Carpenter's voice reeked of contempt towards G.V.

> [FN 4] We have reviewed Dr. Carpenter's testimony and have not located any statement resembling the one described by defense counsel.

5. J.C.

J.C. testified that his mother, G.V., had never asked him not to speak to the police. He confirmed defendant had apologized, but "only . . . for in case he offended us." He denied Jane Doe I had told him defendant had touched her on the bottom and kissed her. When asked if he had told the police that defendant had touched his sister's butt (referring to Jane Doe I), he said he remembered saying it but also that the incident had occurred in the context of play. He denied ever telling Jane Doe I that G.V. could have solved the situation herself, and that it was not going to happen anymore and they would live happily ever after if the police did not become involved. He also testified that Jane Doe I loves defendant and he treats the children well.

6. I.C.

I.C. testified that he did not remember if G.V. had ever told him not to talk to the police about this case. After he read a transcript of his interview with police officers, he changed his testimony and said he did remember his mother telling him not to talk to the police. G.V. also told him defendant had apologized for touching Jane Doe I and Jane Doe II. She told I.C. defendant explained he did it because he was light-headed from drinking. On cross-examination, he said that he had never seen defendant do anything inappropriate with his sisters.

United States District Court
Northern District of California

7. Angelica Lopez

Angelica Lopez works in the after-school program at Jane Doe I's school and Jane Doe I was one of her students the year prior to trial. On February 15, 2013, Jane Doe I came to Lopez with a friend and asked if she could keep a secret. Lopez told her, "It depends." Jane Doe I told Lopez about a few incidents in which G.V.'s boyfriend had exposed himself to her, and said he made her get undressed one time in front of him. She described one incident when she was in the kitchen cooking and he came in and just pulled down his pants. She said she had told her mom but her mom did not believe her. She also said she told her sister and that defendant had also exposed himself to the sister. She said her mom also did not believe her sister. The police were called to the school by Lopez's supervisor. Jane Doe I never returned to the after-school program.

8. Detective Shawn Ray

Detective Shawn Ray of the San Pablo Police Department testified that he arranged the February 20, 2013 CIC interview with Jane Doe I. A follow-up interview occurred on April 12, 2013. He also interviewed Jane Doe I's mother and siblings. At this point in the trial, portions of the video of Jane Doe I's February 20, 2013 interview were played for the jury. Jane Doe I ultimately revealed defendant's abuse started when she was about five years old and ended when she was eight or nine.

During this interview, Jane Doe I said that defendant, whom she referred to as her stepfather, had accidently kissed her on the mouth when they were sitting on the couch, because she had moved when he was trying to kiss her on her cheek. Later, she said that her mom "wanted me to lie . . . [¶] . . . [¶] because she doesn't wanna go to jail," and because she did not want Jane Doe I to be separated. When asked "what really happened," she said the year before when she was in the third grade, defendant accidentally touched her and she "didn't like it." He said he was sorry but he kept doing it again. He touched her on her breasts and on her vaginal area. He told her not to tell her mother. The last time something happened was when she and Jane Doe II were taking a shower and he opened the curtain.

Jane Doe I described an incident when defendant called her into her mother's bedroom. She did not want to go, but "had to come . . . because it looked like he was gonna hit me or something, but he didn't." He then grabbed her and touched her breasts while her mother was taking a shower. She also described two other incidents when defendant gave her some money for getting good grades at school and then touched her butt and her private parts. After the incident in the shower, Jane Doe II had told her not to wear shorts because defendant could go under them and touch her. She started wearing leggings under her shorts. Defendant touched her with his hand on top of her clothes. He also had touched her private by reaching his hand under her underwear. One such incident occurred while her mother was cooking, when defendant again called her into her mother's bedroom.

Jane Doe I also described an incident that occurred when she was in the second or third grade when she was in the kitchen getting cereal. Defendant came in, took off his belt, pulled down his pants, showed her his penis, and told her to touch it. She said she told him "no," got her cereal, and left.

Jane Doe I also reported an incident, which she referred to as the "last time," in which she went into her mother's bedroom with nail polish and asked if she could paint defendant's and her mother's fingernails. Defendant said she could paint his if she wiped the polish off afterwards. She painted his fingernails and then left to use the bathroom, locking the door behind her. She was on the toilet when defendant came in, closed the door, and touched the outside of her vagina. Nail polish from his fingernails made a stain on her purple underwear. Nail polish also got on her vagina, which did not feel good. She thought the underwear she was wearing that day was still at her house, although they had been washed. [FN 5]

> [FN 5] Detective Ray collected this pair of underwear and later logged it into evidence. There was no nail polish on the underwear, but it was very worn.

Jane Doe I said the only time defendant touched her when she was in the fourth grade was one time when he kissed her on the mouth. This happened when she was sitting on the living room couch. She had thought he was going to kiss her on the cheek. She also said when she was in the third grade, defendant kissed her on the lips on the couch and also in her mother's bedroom. When asked what kind of kiss it was, she said it was just a kiss but she felt his tongue a little bit and did not like that.

Jane Doe I said defendant admitted to touching her, and her mother gave him two chances to stop. She told Jane Doe II about defendant's acts at the time he was doing it. Her sister told her that defendant had touched her too. Her oldest brother (J.C.) told her that she should not have involved the police because their mother could have solved it and they would have lived happily ever after.

A second interview with Jane Doe I was conducted on April 12, 2013. During the interview, she said she had asked her sister to tell their mother about defendant's molestations. Her mother asked her if it was true and then apologized to Jane Doe II for not believing her own earlier complaints about defendant's conduct. She also said there had been a time when she was taking a shower by herself and defendant looked in on her and touched her on her stomach. She told her sister about that incident.

Jane Doe I revealed that during the incident where defendant showed her his penis in the kitchen, she did touch it once with her hand because she was afraid that he would touch her more and more if she refused. Later, he picked her up when he was fully clothed, set her down by the sink and pulled her close to him so that their private parts touched. She also described another time in her mother's bedroom when he showed her his penis and told her to touch it. She said she did not touch his penis at that time. Another time in the bedroom, he picked her up while she had clothes on and put her private area on his

exposed penis. On two other occasions defendant had kissed her on the mouth. He had expressed that he wanted her to kiss him on the mouth. Also, one time he kissed her on her leg.

Detective Ray then testified that he interviewed Jane Doe II on February 20, 2013. She corroborated the shower incident and said that she had told her sister to wear clothing that covered her legs and skin so that she would not attract defendant. She also said defendant had kissed her and touched her breasts and butt on top of her clothes twice when she was 17 or 18 years old. He had told her not to say anything to her mother. Jane Doe I told her the previous year that defendant had kissed her (Jane Doe I), touched her breast and vagina over her clothing, and shown her his penis. Jane Doe II said that she believed her sister "because I mean it had already happened to me." When she told her mother about what Jane Doe I had disclosed, G.V said she would talk to defendant and keep an eye on him. He reportedly responded that he was drunk and did not know what he was doing, and said that Jane Doe I was lying.

9. Officer Enrik Melgoza

Officer Enrik Melgoza interviewed Jane Doe I at her school on February 15, 2013. She told him that her stepfather had touched her on her private parts both on top of and under her clothes. He also had touched her breasts and butt several times outside her clothes. She also said that one morning when she was fixing herself a bowl of cereal he came up behind her and began rubbing her shoulders. When she turned around, he had his penis out. She told her mother but her mother did not believe her, but her sister did believe her because it had happened to her as well.

Melgoza also translated an interview with G.V., in which she admitted she had told her children to lie to the police. She also said defendant had admitted to her what he had done.

B. Defense Case

1. A.C.

A.C. was defendant's 33-year-old nephew. He testified that he grew up in Guatemala in a family community where defendant lived. There were four families living there, including 10 to 15 children. He never saw defendant act inappropriately towards any of the children.

A.C. came to the United States in 2008 and lived with defendant. He never saw defendant act inappropriately with any children or young people in the home or in the apartment complexes where they both worked. He also was living with defendant in November 2012 up until the day of defendant's arrest. In 2010, A.C. met G.V. and the children when they went to her house to have lunch. Her children greeted defendant and Jane Doe I gave defendant a hug. He had never heard of anyone in the community thinking defendant had a reputation of being inappropriate with children.

2. M.C.M.

M.C.M. is defendant's daughter and was 23 at the time of trial. She moved to the United States in 2006 when she was 16 years old. Before that, defendant lived in the family compound in Guatemala. His interactions with children were really good, and he never acted in a way that she considered inappropriate.

After M.C.M. moved to the United States, she met G.V. and her children. She would go to their house a lot and was friendly with the children. She saw that he treated G.V.'s children like a father, and she never saw anything that made her think he was not acting appropriately with the girls. The children never told her anything about his behavior and always acted normal.

When M.C.M. was in high school, she would have her girlfriends over to the house. They never expressed any concerns about being around her father. A friend of hers lived with her and defendant for a year and a half after her friend's mother kicked her friend out. Defendant was very protective of the friend and helped her get a job. Also, a young female cousin lived with them for about two years. The girl got along well with defendant, and M.C.M. never saw any problems in defendant's interactions with her.

3. Defendant's Testimony

Defendant testified on his own behalf. He was 53 years old at the time of trial. He first met G.V. at an apartment building in San Francisco where he was the resident manager and she was a tenant. She was living there with her husband and children. She eventually separated from her husband and moved to San Pablo. He and G.V. stayed in contact and their relationship became romantic. He started spending nights at her apartment. He lived in San Francisco and worked there remodeling apartments. Sometimes his work took him to Oakland and Walnut Creek. G.V. worked in San Francisco. He would sometimes pick her up and take her to her apartment in San Pablo. He did not remember ever going to her apartment when she was not there. There were times when he was in a room alone with the children.

G.V.'s children did not accept him right away, but over time he did "win them over" and treated them as he treated his own children. In the last few years, all the children treated him as if he was their stepfather. He greeted them with kisses, played games, and helped with their homework. He rewarded them when they did well. He denied having any problems with Jane Doe II. He never forced hugs on her. One time when they were playing a game called "freeze," she said he had touched her buttocks. He apologized and said he did not notice. She did not seem angry.

On February 15, 2013, G.V. told him Jane Doe I reported he had touched her, but did not give him the details. He did not admit to G.V. that he had touched her daughters. He told her he had never done anything to the children, apologized if at some time there was an accident, and said he was not going to return to her house. Prior to

> that time, G.V. had never talked to him about inappropriately touching her daughters. Defendant stayed in contact with G.V., who told him that Jane Doe I had gone to Martinez for the first CIC interview. Defendant was arrested on March 26, 2013.
>
> The recorded jail phone call between defendant and G.V. occurred before Jane Doe I's second CIC interview. He denied asking G.V. to tell her to lie. Instead, he "told her not to be afraid, that only—that she should just tell the truth, which is the opposite. That's why I said, 'You have to say the opposite.' At no time did I say, 'lie.'" He denied committing any of the allegations against him.
>
> He remembered the day Jane Doe I painted his fingernails. He denied following her into the bathroom afterwards or touching her vagina. He said it was possible that he had gone into the bathroom when the two girls were taking a shower, but he had never intentionally gone inside the bathroom while someone was in there. He also denied touching Jane Doe I's vagina under or over her clothes. He would hug her, but would not intentionally try to do something untoward. He also denied showing her his penis and asking her to touch it, or picking her up and putting his private area on hers. He had never intentionally touched her inappropriately. He had never been accused of inappropriate sexual behavior towards a child and had never touched a child in that way. He also had never been arrested before this case.
>
> On cross-examination, defendant stated that he was sometimes in G.V.'s apartment without her being present when she had to run an errand. This happened four times a month. He denied ever telling G.V. that he had touched the girls because he had been drinking.

*Cabrera*, 2019 WL 168534, at *1–8.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Additionally, habeas relief is warranted only if the constitutional error at issue "had substantial and injurious effect or influence in determining the

jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The district court reviews the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991). The California Court of Appeal was the highest state court to have reviewed Cabrera's claims in a reasoned decision; the California Supreme Court denied his petition for review. Accordingly, the Court here reviews the January 11, 2019 unpublished disposition of the California Court of Appeal.

**IV. DISCUSSION**

Cabrera raises three grounds for federal habeas relief: (1) that his due process rights were violated by the admission of Child Sex Abuse Accommodation Syndrome ("CSAAS") expert testimony by a pediatrician who also examined the victim; (2) that there was insufficient evidence

to support his convictions under California Penal Code § 288(b); and (3) that his 75-year sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.[2]

**A. CSAAS Testimony**

Cabrera first contends that the state court erred by concluding that the admission of CSAAS testimony did not violate his constitutional right to due process.

**1. State Court Opinion**

The state appellate court summarized and rejected Cabrera's claim as follows:

> Defendant challenges the admission of Dr. Carpenter's CSAAS testimony. He contends the trial court abused its discretion by allowing Dr. Carpenter to testify beyond permissible limits, and in a manner that expressed a negative opinion of Jane Doe 1's recantation.
>
> It is well settled in California that CSAAS testimony is admissible in limited contexts, such as to rebut common misconceptions the jury might hold about how child victims react to sexual abuse. (*See People v. McAlpin* (1991) 53 Cal. 3d 1289, 1300–1301 (*McAlpin*); *People v. Perez* (2010) 182 Cal. App. 4th 231, 243–245; *People v. Sandoval* (2008) 164 Cal. App. 4th 994, 1001–1002; *In re S.C.* (2006) 138 Cal. App. 4th 396, 418; *People v. Patino* (1994) 26 Cal. App. 4th 1737, 1744–1747 (*Patino*); *People v. Housley* (1992) 6 Cal. App. 4th 947, 957 (*Housley*); *People v. Bowker* (1988) 203 Cal. App. 3d 385, 392–394 (*Bowker* ).) The admissibility of CSAAS evidence is based on Evidence Code section 801, subdivision (a), which authorizes expert testimony on a subject "that is sufficiently beyond common experience that the opinion of [the] expert would assist the trier of fact." (See *People v. Brown* (2004) 33 Cal. 4th 892, 905 (*Brown* ).)
>
> Because child sexual abuse victims often behave in ways that seem contrary to what would be expected of a typical crime victim, it has been recognized by the courts that expert testimony is helpful on these issues. (*See Patino*, *supra*, 26 Cal. App. 4th at p. 1745; *People v. Sanchez* (1989) 208 Cal. App. 3d 721, 735–736.) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin*, *supra*, 53 Cal. 3d at p. 1301; *see Patino*, at p. 1744.) "CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience." (*Bowker*, *supra*, 203 Cal. App. 3d at p. 394.) Thus, the evidence is admissible to rehabilitate a child victim's credibility when the defense suggests that the victim's conduct after the incident, such as secrecy or delayed reporting, is inconsistent with his or her testimony regarding the molestation. (*McAlpin*, at p. 1300; *see Brown*, *supra*, 33 Cal. 4th at p. 906.)

[2] Cabrera raises the same three claims in the original and amended petitions.

> CSAAS evidence is not admissible to prove that a molestation actually occurred. (*McAlpin*, *supra*, 53 Cal. 3d at p. 1300; *Bowker*, *supra*, 203 Cal. App. 3d at p. 391.) Because of the danger that a jury improperly could use such evidence to corroborate the victim's testimony and infer that the abuse occurred, courts have imposed limitations on the admission of the evidence. (*Housley*, *supra*, 6 Cal. App. 4th at p. 955; *Bowker*, at pp. 393–94.) First, the CSAAS testimony must be addressed to specific myths or misconceptions suggested by the evidence. (*Housley*, at p. 955; *Bowker*, at p. 394.) Second, courts have a duty to instruct the jury that the CSAAS testimony is not evidence that the victim's molestation claim is true, but is admissible solely to show that the victim's conduct is not inconsistent with having been molested. (*Housley*, at p. 955; *Bowker*, at p. 394.)
>
> "[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'" (*McAlpin*, *supra*, 53 Cal. 3d at p. 1299; *see People v. Catlin* (2001) 26 Cal. 4th 81, 131 [review decision to admit expert testimony for abuse of discretion].) "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Prieto* (2003) 30 Cal. 4th 226, 247; *see People v. Watson* (1956) 46 Cal. 2d 818, 836 (*Watson* ).)
>
> Defendant complains that Dr. Carpenter's testimony exceeded the limitations set forth in the above cases. He first asserts "the evidence in this case did not implicate any myth or misconception regarding the frequency of stranger versus family member abuse." He also states that "no myth or misconception was presented by the evidence regarding how abuse may progress over time."
>
> As to the first assertion, under similar circumstances, the court in *McAlpin*, *supra*, 53 Cal. 3d at pp. 1302–03, held it was not an abuse of discretion to allow an expert to testify that there is no typical profile of a child molester: "'The layperson imagines the child offender to be a stranger, an old man, insane or retarded, alcohol or drug addicted, sexually frustrated and impotent or sexually jaded, and looking for "kicks." . . . These are popular notions appealing in their simplicity . . . and they offer the advantage of making the child offender as different and unlike the ordinary person—ourselves, our parents, our children, our relatives, friends, and teachers—as possible.' [Citations.] [¶] This stereotype, however, is false." Similarly, here, the trial court did not abuse its discretion by allowing the expert to testify that child molesters are commonly known and trusted by the child, usually a family member, to dispel the common misconception that only a stranger could commit such acts.
>
> The testimony that sexual abuse generally progresses from simple touching to more complex sexual acts is not unrelated to the facts of this case, as the touching here progressed from defendant's hand contact over clothing to contact with Jane Doe I's naked vagina and defendant's exposed penis. Regardless, defendant's argument that the prosecution was required to identify the alleged myths and misconceptions at issue represents an overly narrow reading of cases such as *Bowker*. The court in *Patino* explained that "[i]dentifying a

'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Patino*, *supra*, 26 Cal. App. 4th at pp. 1744–1745.) Here, the victim's credibility was clearly at issue due, in part, to behavior seemingly inconsistent with having been molested, including her delayed reporting and subsequent recantation.

Defendant also complains that Dr. Carpenter "improperly made comments designed to elicit sympathy for child abuse victims, such as characterizing children who report abuse as 'brave,' and testifying to the effect that children whose parents do not believe and support them will fare poorly." He concedes that the latter testimony was offered in response to a question to which the court sustained objections, [FN 6] but complains the jury was not instructed to disregard testimony that was not expressly stricken after an objection to a question had been sustained. However, even if it considered this testimony, the jury could not have been unduly swayed as Dr. Carpenter did not mention Jane Doe I by name and did not suggest or imply that he was describing her specifically.

> [FN 6] The court gave the jury CALCRIM No[.] 222: "During the trial the attorneys may have objected to questions or moved to strike answers given by the witnesses. . . . [¶] If I sustained an objection, you must ignore the question . . . . [¶] If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

Defendant also criticizes the admission of Dr. Carpenter's testimony because the doctor testified both as the prosecution's CSAAS expert and as the pediatrician who took a history from and examined Jane Doe I. While defendant cites to cases that he believes "recognize the danger created when an expert gives both general testimony about the CSAAS theory and specific testimony about the child in the case," he does not cite to any case that prohibits an expert from testifying in a dual role. Based on his testimony as a whole, we do not find that Dr. Carpenter's CSAAS testimony hewed too closely to the facts of this case. And even where it had the potential to veer in that direction, the court sustained defendant's objections and ordered the prosecutor to drop that line of questioning.

As noted above, the trial court properly admonished the jury as to the limited purpose of Dr. Carpenter's expert CSAAS testimony, during which he neither mentioned the facts of this case nor expressed an opinion that implied Jane Doe I was telling the truth during her forensic interviews, nor that the molestations occurred. His testimony as an examining physician was segregated from his testimony as an expert witness. Defendant's argument that Dr. Carpenter's tone of voice suggested that he did not believe the child when she said during the examination that she had never been touched is insufficient to establish error. The court did not concur with this negative impression raised by defense counsel after the witness's testimony. Without any affirmative showing otherwise, defendant's conclusory

assertion that the expert testimony was given undue influence by the jury because he also testified about his nonacute examination is purely speculative on this record.

Moreover, the jury was properly instructed pursuant to CALCRIM No. 1193. The CSAAS instruction that the trial court gave at the end of the case contained the same CALCRIM No. 1193 language that the court gave before Dr. Carpenter testified, plus a paragraph, presumably drafted by defendant's trial counsel, stating, "You may not consider evidence of the Child Sexual Assault Accommodation Syndrome to automatically conclude that where a child meets all or some of the five criteria, that the child has been abused. [¶] The People still have the burden of proving each count beyond a reasonable doubt." CALCRIM No. 1193 comports with *McAlpin*, *supra*, 53 Cal. 3d at pp. 1300–01, which holds that that CSAAS testimony may be used for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation, and to explain seemingly self-impeaching behavior. The instruction is a correct statement of the law. Defendant points to nothing in the record to undermine our confidence that the jury followed this instruction in reaching its verdict. (*See generally People v. Holt* (1997) 15 Cal. 4th 619, 662 [jurors are presumed to understand and follow the trial court's instructions].)

Our review of the record in light of the pertinent law reveals the trial court did not abuse its discretion when it admitted Dr. Carpenter's expert testimony concerning CSAAS. By the time he was called to testify as an expert, Jane Doe I, her mother, and Jane Doe II had offered testimony attacking the credibility of Jane Doe I's CIC interviews. The issue of retraction made the CSAAS evidence relevant in this case and its admission proper in the prosecutor's case-in-chief to rehabilitate the victim's credibility. In discussing the proper use of CSAAS evidence, the court in *Bowker* observed that "[w]here an alleged victim recants his [or her] story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings." (*Bowker*, *supra*, 203 Cal. App. 3d at p. 394.)

In any event, even if the CSAAS evidence was improperly admitted, any error was harmless. (*Watson*, *supra*, 46 Cal. 2d at p. 836.) [FN 7] Other evidence presented in the case strongly supports the verdicts. While Jane Doe I recanted her accusations at trial, she consistently alleged abuse during both of her CIC interviews and in her initial reports to Lopez and the police. The testimony of G.V. and Jane Doe II, while consistent with Jane Doe I's recantation, was impeached by the prosecutor and the jury thus had grounds to question their accounts. In addition, I.C. corroborated evidence of defendant's confession, as well as evidence that G.V. had told the children to lie to the police by denying abuse had occurred.

> [FN 7] Defendant also asserts a violation of his due process rights because Dr. Carpenter's testimony was an improper invasion of the province of the jury to decide this case. The essence of a due process



United States District Court
Northern District of California

> violation is a denial of a criminal defendant's right to a fair trial. (*See People v. Bell* (1989) 49 Cal. 3d 502, 534.) He fails to demonstrate how his fundamental right to a fair trial was violated by the introduction of CSAAS testimony to address the victim's credibility, which was put at issue by her recantation and the testimony of family members contradicting her prior reports of abuse. Additionally, "'[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe'" on a defendant's constitutional rights. (*People v. Prince* (2007) 40 Cal. 4th 1179, 1229.) Defendant's due process claim is "without merit for the same reasons that [his] state law claims" are without merit. (*Ibid.*)

*Cabrera*, 2019 WL 168534, at *8–11.

**2. Applicable Federal Law**

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis in original).

**3. Analysis**

As the Ninth Circuit has explained, "CSAAS testimony is admissible in federal child-sexual-abuse trials[]when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." *Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003). To the extent Cabrera challenges Dr. Carpenter's CSAAS testimony, the state appellate court reasonably concluded that Dr. Carpenter's CSAAS testimony was admissible; such testimony is admissible under *Brodit*, 350 F.3d at 991, and relevant, as the state appellate court observed, because "the victim's credibility was clearly at issue due, in part, to behavior seemingly inconsistent with having been molested, including her delayed reporting and subsequent recantation." *Cabrera*, 2019 WL 168534, at *10.

The state appellate court also reasonably concluded that the fact that Dr. Carpenter testified

both as a CSAAS expert and as Doe's examining physician did not violate Cabrera's due process rights. Cabrera cites no Supreme Court authority to support his contention that permitting an examining physician to testify in both capacities violates a defendant's right to due process. While Cabrera argues that the jury could have impermissibly conflated Dr. Carpenter's testimony about CSAAS with his later testimony about his examination of Doe, he offers no evidence to support this contention.

Even assuming the admission of any of Dr. Carpenter's testimony was in error, no prejudice resulted under *Brecht*, 507 U.S. at 619. The trial court properly instructed the jury about how they were permitted to consider the CSAAS testimony, and juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997). Cabrera does not offer any evidence to suggest that the jury did not follow the trial court's limiting instructions. The state appellate court's conclusion that the jury followed this instruction in reaching its verdict was reasonable. Further, as the state appellate court noted, the jury was presented with substantial evidence of guilt, including evidence of Jane Doe I's initial, consistent allegations of abuse, and I.C.'s corroboration of Cabrera's confession. The state appellate court's conclusion that any error was harmless was not unreasonable.

Cabrera fails to establish that the state appellate court's rejection of this claim was contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent. Accordingly, the Court must deny this claim.

**B. Sufficiency of the Evidence of Forcible Lewd Acts**

Cabrera contends that there was insufficient evidence of duress to sustain his convictions under Section 288(b)(1).

**1. State Court Opinion**

The state appellate court summarized and rejected this claim as follows:

> In determining whether the evidence is sufficient to support a conviction, we "review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Under this standard, the court

> does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Hatch* (2000) 22 Cal. 4th 260, 272, italics omitted.)
>
> The elements of a section 288, subdivision (b)(1) violation differ from the elements of a section 288, subdivision (a) violation in only one respect. A section 288, subdivision (b)(1) violation occurs only where the lewd act is accomplished "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 288, subd. (b)(1).) We find sufficient evidence to support the convictions based on a finding that the sexual acts were committed by means of duress. "'Duress' has been defined as 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.'" (*People v. Schulz* (1992) 2 Cal. App. 4th 999, 1005 (*Schulz.*)
>
> Defendant first addresses counts 14 and 15. These counts were each based on defendant kissing Jane Doe I on the mouth. Count 14 was based on him doing so "[t]he first time" and count 15 was based on him doing so "[t]he second time." Defendant asserts there was insufficient evidence of the required use of fear or duress required by section 288, subdivision (b)(1) as to the two kissing incidents. He observes that the prosecutor did not make any fear or duress argument to the jury specifically addressing the facts involved in the kissing incidents. However, he concedes the prosecutor argued that fear and duress had occurred in connection with all of the section 288, subdivision (b)(1) counts.
>
> Because the abuse here involved a continuous course of conduct, we conclude the jury could have found that the kissing incidents, and other incidents highlighted by defendant, such as the breast touch counts, were accomplished by means of duress. Jane Doe I was less than nine years old when these offenses were first committed. She was much younger, as well as physically much smaller, than defendant, who, as a father figure, held a position of parental authority over her. These two factors were constant as to every act of abuse. When the abuse started, he told her not to tell her mother, which to a child would naturally imply adverse consequences if she disobeyed. She stated that on one occasion when he touched her vagina over and under her clothes, she wanted to leave and tell her mother, but felt too scared and nervous to do so. She did not know why what defendant was doing scared her. On at least one occasion, he physically restrained her by grabbing her as she attempted to leave the bedroom. He also ordered her to come into the bedroom in such a way that she felt like she "had to come . . . because it looked like he was gonna hit me or something, but he didn't." On other occasions, he cornered her while she was naked in the shower, and picked her up off the floor so that he could rub his penis against her vaginal area. She further stated that when defendant showed her his penis in the kitchen, she did touch

it once with her hand because she was afraid that if she did not touch it he would touch her more. Even if an act, such as a kiss, was not itself accompanied by an immediate simultaneous overt application of force or duress, past acts involving such force or duress would necessarily have influenced her vulnerability to each subsequent act of sexual abuse.

We find support in *People v. Cochran* (2002) 103 Cal. App. 4th 8 (*Cochran*), in which the appellate court stated: "The very nature of duress is psychological coercion." (*Id.* at p. 15, disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12 (*Soto*).) Likewise, in *Schultz, supra*, 2 Cal. App. 4th at page 1005, the court explained: "[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. [Citations.] 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' [are] relevant to the existence of duress." A physical size disparity between the defendant and the victim may contribute to the victim's sense of vulnerability. (*People v. Pitmon* (1985) 170 Cal. App. 3d 38, 51. Instructively, the appellate court in *Pitmon* observed that "at the time of the offenses, [the victim] was eight years old, an age at which adults are commonly viewed as authority figures. The disparity in physical size between an eight-year-old and an adult also contributes to a youngster's sense of his relative physical vulnerability. . . . These factors all bear upon the susceptibility of a typical eight-year-old to intimidation by an adult." (*Ibid.*)

As the California Supreme Court has explained, "[D]uress is measured by a purely objective standard[;] a jury could find that the defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior." (*Soto*, *supra*, 51 Cal. 4th at p. 246.) It does not matter that the victim did not fight back or even consented to the molestation. "[T]he focus must be on the defendant's wrongful act, not the victim's response to it." (*Ibid.*) [FN 9] Indeed, "it is the defendant's menacing behavior that aggravates the crime and brings it under section 288[, subdivision](b)" (*Soto*, *supra*, 51 Cal 4th at p. 243.) And while defendant stresses that he did not tell Jane Doe I what the consequence would be if she told her mother about the abuse, a simple warning to a child not to report molestation reasonably implies the child should not resist or protest the sexual advance. (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.) Taking all the circumstances together, we conclude there was sufficient evidence of duress, manifested as an implied threat of force or retribution, for a reasonable jury to find the contested offenses constituted violations of section 288, subdivision (b)(1).

> [FN 9] Defendant's reliance on *People v. Espinoza* (2002) 95 Cal. App. 4th 1287 (*Espinoza*) does not persuade us otherwise. In *Espinoza*, the defendant molested his then 12-year-old daughter on several occasions, and at trial she testified she was "'too scared to do anything'" while her father was molesting her and was afraid to report the molestation because

> she thought he "'would come and do something.'" (*Id.* at pp. 1292–1293.) The *Espinoza* court concluded there was insufficient evidence of duress because the victim never testified the defendant used "any 'direct or implied threat' of any kind." (*Id.* at p. 1321.) To reach this conclusion, the court relied on *People v. Hecker* (1990) 219 Cal. App. 3d 1238, which held: "'Psychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.'" (*Id.* at pp. 1250–1251.) We find, as discussed above, there was evidence of implied threats here; nevertheless, we decline to follow the overly broad pronouncements of *Espinoza* and *Hecker* and join other courts who have questioned the language and reasoning in both cases. (*See, e.g.*, *People v. Veale* (2008) 160 Cal. App. 4th 40, 48–50.) As the *Cochran* court observed, when a father molests a young victim in the family home, "in all but the rarest cases duress will be present." (*Cochran, supra*, 103 Cal. App. 4th at p. 16, fn. 6.)

*Cabrera*, 2019 WL 168534, at *11–13.

**2. Applicable Federal Law**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Where the evidence in support of a conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, a state prisoner is entitled to federal habeas relief. *Jackson v. Virginia*, 443 U.S. 307, 321 (1979).

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings." *Coleman v. Johnson*, 566 U.S. 650, 650 (2012) (per curiam). "On habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court . . . [but] instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). In applying *Jackson*, a federal habeas court must ask whether the operative state court decision "reflected an 'unreasonable application' of *Jackson* and *Winship* to the facts of the case." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)). To grant relief, the court must conclude that "the state court's determination that a

rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964–65 (9th Cir. 2011).

**3. Analysis**

The state appellate court's determination that a rational jury could have found sufficient evidence of duress was not objectively unreasonable.

First, the state appellate court's determination of what constitutes duress under state law may not be disturbed by a federal habeas court. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law.").

Further, the state appellate court's determination that a rational jury could have found sufficient evidence of duress under California law was not objectively unreasonable. California courts define "duress" as "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." *Schulz*, 2 Cal. App. 4th at 1005. "Because duress is measured by a purely objective standard, a jury could find that the defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior." *Soto*, 51 Cal. 4th at 246. As the state appellate court reasonably determined, the evidence before the jury provided a sufficient basis to find duress throughout the course of conduct charged here, including the following: Jane Doe I was under nine years old when the course of conduct began; Cabrera was much older and larger than her; Cabrera held parental authority over her; Cabrera told Jane Doe I not to tell her mother; and Cabrera physically restrained Jane Doe I on at least one occasion. *See Cochran*, 103 Cal. App. 4th at 16 n.6 ("[A]s a factual matter, when the victim is [nine years old] and is molested by her father in the family home, in all but the rarest cases duress will be present.").

The state appellate court's determination that a rational jury could have found sufficient

United States District Court
Northern District of California

evidence of duress under California law was not an unreasonable application of *Jackson* and *Winship*. Therefore, this claim is denied.

**C. Length of Sentence**

Cabrera contends that his 75-year sentence constitutes cruel and unusual punishment under the Eighth Amendment.

**1. State Court Opinion**

The state appellate court summarized and rejected this claim as follows:

> The trial court sentenced defendant to an aggregate term of 75 years. The trial court sentenced defendant to consecutive terms in accordance with the statutory mandates for convictions under [California Penal Code] section 288, subdivision (b)(1). (See § 667.61, subd. (i).) Defendant contends his sentence—in his case, a de facto sentence of life without the possibility of parole given his age of 53 at the time of sentencing—constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. More specifically, he contends this sentence is unconstitutional under *Coker v. Georgia* (1977) 433 U.S. 584, 592 (*Coker*), which held that "a punishment is 'excessive' and unconstitutional if it . . . makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering." Defendant argues his sentence falls under this definition because it "serves no legitimate penal purpose." We are not persuaded.
>
> The goals of criminal punishment include vindication of society's sense of justice, protecting society from criminal harms, and deterring criminal behavior. (See *People v. Mesce* (1997) 52 Cal. App. 4th 618, 632 [The "classic concerns of sentencing" are "retribution, deterrence, and incapacitation."]; see also *In re Nuñez* (2009) 173 Cal.App.4th 709, 730 ["Valid penological goals include retribution, incapacitation, rehabilitation, and deterrence."].) Here, defendant's repeated and predatory sexual assaults affected Jane Doe I at an extremely vulnerable time in her life, realistically leading to lifelong consequences for her. Additionally, defendant continued to commit the offenses over three or four years, a considerable span of time. Given this record, the sentence defendant received furthered acceptable penological goals of retribution, deterrence, and incapacitation and, accordingly, was not excessive under *Coker*.
>
> Defendant further argues his sentence "serves no rational legislative purpose, under either a retributive or a utilitarian theory of punishment." He relies on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal. 4th 585, 600–602 (conc. opn. of Mosk, J. [any sentence longer than the human life span can serve no rational penological purpose and is inherently cruel and unusual] ). But as *People v. Byrd* (2001) 89 Cal. App. 4th 1373 clarified when confronted with the same argument, "'no opinion has value as a precedent on points as to which there is no agreement of a majority of

> the court. [Citations.]' [Citations.] Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion [in *Deloza* ], it has no precedential value." (*Id.* at p. 1383.) Furthermore, as the *Byrd* court observed, a sentence in excess of a human life span does serve "valid penological purposes: it unmistakably reflects society's condemnation of [the] defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future." (*Ibid.*) Accordingly, we reject defendant's claim that a sentence like his, which reasonably exceeds human life expectancy, serves no rational penological purpose and in turn is unconstitutional under *Coker*, *supra*, 433 U.S. 584.

*Cabrera*, 2019 WL 168534, at *13–14.

**2. Applicable Federal Law**

The Eighth Amendment contains a "narrow" proportionality principle. *Graham v. Florida*, 560 U.S. 48, 59–60 (2010). The principle "'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'" *Id.* at 60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997, 1000–01 (1991)). "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289–90 (1983); *see also Crosby v. Schwartz*, 678 F.3d 784, 795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and extreme, and constitutional violations on that ground are 'only for the extraordinary case.'") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003)).

To determine whether a non-capital sentence is grossly disproportionate, the court first determines whether an inference of gross disproportionality arises from a threshold comparison between the gravity of the offense and the severity of the sentence. *Graham*, 560 U.S. at 59. In the "rare case" in which such an inference arises, the Court compares the sentence with sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Id.* "If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." *Id.* (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (opinion of Kennedy, J.)).

**3. Analysis**

The state court reasonably concluded that Cabrera's sentence does not violate the Eighth Amendment. Cabrera fails to show his sentence is a rare or extreme case of a grossly

disproportionate sentence. *See Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (sentence of life without parole for cocaine possession was not grossly disproportionate); *Norris v. Morgan*, 622 F.3d 1276, 1292–96 (9th Cir. 2010) (sentence of life without parole for child molestation was not grossly disproportionate). Further, as the state appellate court noted, given Cabrera's repeated assaults on Jane Doe I over three to four years, "the sentence [he] received furthered acceptable penological goals of retribution, deterrence, and incapacitation." *Cabrera*, 2019 WL 168534, at *13; *see also Norris*, 622 F.3d at 1294 ("[T]he impact of [child molestation] on the lives of [its] victims is extraordinarily severe.") (second and third alteration in original) (quoting *Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994)).

The state court's decision was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Accordingly, the Court must deny this claim.

**D. Certificate of Appealability**

A district court must either grant or deny a certificate of appealability when it enters a final order denying habeas relief. 28 U.S.C. § 2254 R. 11(a). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," and it must specify which issues satisfy that standard. 28 U.S.C. § 2253(c)(2)-(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Cabrera has not made such a showing on any of his claims, and the Court will therefore deny a certificate of appealability.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

**CONCLUSION**

All claims from the amended petition are denied, and a certificate of appealability will not issue. Cabrera may seek a certificate of appealability from the Ninth Circuit Court of Appeals. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: August 9, 2023



JON S. TIGAR
United States District Judge